Aug. 12,
1875.                   HATHAWAY *v.* NOBLE.

*Equity jurisdiction—Stale demands.*

Where there have been gross laches in prosecuting rights, or long and un-
reasonable acquiescence in the assertion of adverse rights, a court of
equity will refuse to interfere.

A court of equity will not impeach a transaction on the ground of fraud,
where the fact of its having been committed has long been within the
knowledge of the party complaining, nor where he might have discov-
ered the circumstances of fraud by the exercise of ordinary diligence.

A executed a mortgage of real estate to B in 1848, which was duly re-
corded, purporting to secure an indebtedness from him to B. In 1849,
B recovered a judgment against A for the possession of the mortgaged
premises, upon which judgment a writ of possession issued, and B there-
upon took possession, and remained in possession ever after, taking the
rents and profits. In 1874, C, who held a valid claim against A at the
time of the execution of said mortgage, upon which he recovered a
judgment in 1855, brought a bill in equity to set aside the mortgage to
B upon the ground of fraud which he had but recently discovered.
*Held,* that the record of B's mortgage and judgment, and her open and
public possession of the mortgaged premises, taking the rents and
profits for twenty-five years, were sufficient to put C upon inquiry, and
therefore that he could not maintain his bill.

IN EQUITY. Benjamin Hathaway, of Plymouth, Mass., complains
against Elizabeth Noble and Jeremiah Noble, both of Portsmouth,
Stark W. Lewis, of New York, Joshua Eldridge, of Chatham, Mass.,
James N. Tarleton, of Middletown, Conn., and William H. Y.
Hackett and James W. Emery, both of Portsmouth, alleging that
on July 12, 1848, Moses Noble, formerly of Portsmouth, but now
deceased, was indebted to the plaintiff in the sum of $2,337.53, upon
two promissory notes, due and payable in September, 1848, and which
have never been paid ; that said Moses Noble endorsed other notes for
the benefit of one Locke, which Locke failed to pay ; that said Moses
Noble, as the plaintiff is informed and believes, on July 13, 1848,
made several notes without consideration, and secured the same
by mortgages upon all his real estate in Portsmouth, for the purpose
of covering up his property, and for the purpose of deterring his
creditors from attempting to collect their debts by reason of the large
amount of pretended debts secured by mortgages upon his property,
exceeding in amount the total value of his real estate ; that in pur-
suance of said fraudulent design, said Moses Noble, July 12, 1848,
made and delivered to said Stark W. Lewis two false notes,—one for
$5,000, payable in six months from date to said Lewis or order, and

one for $4,000, payable in nine months from date to said Lewis or order,—and secured the same by a mortgage on all his real estate in Portsmouth, and recorded said mortgage July 13, 1848; that afterwards, on July 12, 1848, in pursuance of the same fraudulent design, the said Moses Noble made and delivered to one Sally Noble, now deceased, a false note for $3,000, and secured the same by a mortgage of the same date, and recorded July 19, 1848; that afterwards, in pursuance of the same fraudulent design, said Moses Noble made and delivered to said Elizabeth Noble a false note for the sum of $1,000, and secured the same by a mortgage dated July 12, 1848, and recorded July 19, 1848; and that said Moses included in said mortgages "all his real estate of every kind and description," and said real estate is not otherwise described in the bill. The bill further alleges, that said Moses Noble, at or about the same time, made false and fraudulent conveyances of all his personal property for the same fraudulent purpose, including shipping and their lading of various kinds, of the value of many thousands of dollars, of which said Lewis took possession; that said Lewis and said Eldridge caused said vessels to be reënrolled in the records of the custom-house in the name of said Lewis, without right or change of title; that said Lewis, after holding said titles a few months, ceased to do so, and the same were reënrolled in the name of said Tarleton, and continued enrolled in his name, although said Moses Noble continued to have the use, income, and profits thereof as he had done before said enrollment; and that said Lewis and Tarleton accounted for the avails thereof with said Moses Noble.

The bill then charges, that said Lewis, Eldridge, Tarleton, Elizabeth Noble, and Jeremiah Noble aided and assisted said Moses Noble in covering up his property from time to time, so that his creditors were unable to reach it, and that they severally took more or less of the property and of its avails for said fraudulent purpose, and permitted the avails thereof to be used and appropriated by said Moses in fraud of his creditors, and of the rights of his assignees as trustees of his creditors. And the plaintiff charges, that they, by their fraudulent conduct, " have made themselves liable for all the property which the said Moses has so taken, which should have been paid over to his assignees; and that said defendants are liable to account for the same, as the plaintiff has by their acts been kept from securing his debt, which he could have done if the said Moses had not been aided and assisted by other parties fraudulently as aforesaid."

The bill further alleges, that on July 21, 1848, said Moses Noble assigned to the defendants Hackett and Emery, for the benefit of his creditors, all his property, real and personal, " in order to cut off all suits and attachments which otherwise might have been made thereon, and to cut off all attempts by creditors to reach the same except through said assignees;" and that said assignment was made " so that he might be in the hands of his chosen friends, and all creditors would be helpless as against said mortgages and assignment."

The plaintiff further charges, that at the time said mortgages and assignment were executed, said Moses was tenant in common with said Elizabeth Noble, Jeremiah Noble, Sally Noble, now deceased, " and others," of the real estate purporting to be covered by said mortgages, and that the possession of the said " Elizabeth, Jeremiah, Sally, and als," could not be and has not been adverse to the other tenants in common ; that by the assignment to said Emery and Hackett, " the creditors, through said assignees, became possessed, as tenants in common with said Sally and Elizabeth, and the other tenants in common, of said real estate ; and that the rights of the creditors in said estate, through said assignees, were and still are perfect, and the creditors have a right to redeem said mortgages, through said assignees, and make defence thereto."

The plaintiff further charges, that, said Elizabeth and Jeremiah have received and taken all the rents and profits of the real estate so mortgaged to them, in fraud of the creditors of said Moses and his assignees, and that the amount so received and appropriated is more than would be due them if their mortgages were for a good consideration ; that they are liable to account to said assignees for a large amount of rents and profits due said assignees as such ; and that the mortgages to said Lewis have been settled and given up.

The plaintiff further charges, that he filed his claim with said assignees, and afterwards, at the November term, 1855, of the court of common pleas for Rockingham county, recovered judgment thereon against said Moses for $3,365.61 damages, and $18.20 costs ; that said judgment is in full force ; that he filed with said Hackett, one of said assignees, the execution which issued thereon, " to hold the same against any estate of said Moses he might ever be able as such assignee to discover in any way, and said execution has ever since remained in said Hackett's hands " for that purpose ; " that said assignees, having been deceived by the fraudulent acts aforesaid, the other defendant informed the plaintiff there was no property which he could reach, and he, trusting in their accounts, never caused any examination to be made until within a short time, to wit, within two months now last past, when he employed his present solicitors."

The plaintiff further charges, that the said Elizabeth Noble, for the purpose of carrying out said fraudulent design, brought a suit at the February term, 1849, of the court of common pleas, on her said mortgage, to recover possession of said mortgaged premises ; that said Moses, in pursuance with said fraudulent design, suffered default, and that she, at said term, recovered judgment against said Moses; that neither said assignees or creditors, nor any one who had any interest in said land, was made defendant, and no notice was in any way given to the creditors or persons interested in the title, and therefore that said suit and judgment in no way bars the creditors or other persons interested ; that neither the plaintiff nor said Hackett heard or knew thereof " until within one month now last past, when the plaintiff learned the same for the first time by application to the clerk of said

court through his solicitors in this case;" and that the plaintiff never before had any knowledge or information that there had been any attempt to foreclose the mortgage of said Elizabeth.

The plaintiff further charges, that the writ of possession which issued upon said judgment was never returned into court; that no possession was ever taken under the same; and that the said Elizabeth, in fact, never had any possession under which said mortgage could be foreclosed.

The plaintiff claims that, as a creditor of said Moses, he has the right to redeem said mortgaged premises; that the possession of said Elizabeth Noble has not been adverse, but, as tenant in common, taking all the rents and profits; that the plaintiff's debt is the only claim against the said Moses which has been kept alive; " and that he alone is entitled to the rights of said Moses, which passed to said assignees, so far as his debt is concerned."

The bill prays that the defendants may answer, and for an account of the rents and profits of the real estate received; that the plaintiff may " be permitted to hold said estate still remaining, and the avails, rents, profits, and income thereof, as against said defendant, until sufficient thereof has been taken to pay the plaintiff's debt and interest and costs; and that, if any portion of said mortgages or mortgage debt were honest and due, the said defendant be ordered and decreed to account for the rents and profits received thereon, and that the plaintiff be permitted to redeem said estate from said mortgage; and for such other and further relief as may be just."

There are other averments in the bill not necessary to be mentioned, and others not material in any view of the case.

Elizabeth Noble demurred to the bill, assigning as causes of demurrer: (1) The legal representatives of Moses Noble, deceased, are not made parties to the bill; (2) the legal representatives of Sally Noble, deceased, are not made parties to the bill; (3) the other creditors of Moses Noble are not made parties to the bill; (4) the bill is multifarious for a misjoinder, both of parties and subjects; (5) the plaintiff discloses no sufficient title to enable him to maintain his bill; (6) the bill does not sufficiently describe the property claimed nor the relief prayed for; (7) by the plaintiff's own showing, the mortgage to this defendant described in the bill was long ago foreclosed; (8) by his own showing, the plaintiff has slept upon his rights nearly twenty-six years, and is now barred in law and equity to ask the relief he prays for; (9) because he had a plain and adequate remedy at law. .

The questions raised by the demurrer were transferred from the circuit court by RAND, J.

*Goodall* and *Marston,* for the plaintiff.

*Hatch,* for Elizabeth Noble.

*Butler,* for Jeremiah Noble.

SMITH, J.   The 8th cause of demurrer assigned is, that the plaintiff's claim is stale.   The defendants' mortgage was executed in July, 1848. She obtained a judgment to foreclose it February, 1849, and has since been in the possession of the mortgaged premises, taking the rents and profits, with no attempt at interference from any source, until this suit was brought in 1874,—a period of twenty-six years from the time her title accrued.   The mortgagor has in the mean time died.   Many of the defendants' witnesses, it must be presumed, are dead, and probably the memory of those yet living may have become impaired by lapse of time or the infirmities of age.   Under such circumstances, to compel her to account for the rents and profits, and for expenditures on account of the mortgaged property, would most likely be lending the aid of the law to allow great injustice to be done under the name or pretence of correcting fraud.   During all this time her mortgage was on record, which, with the record of her judgment, would have afforded the plaintiff, or any other creditor of Moses Noble, exact information as to the condition of the defendants' title, if he had shown any vigilance in seeking for information where he would be most likely to find it. There is no charge in the bill that the assignees, Messrs. Hackett and Emery, have not done, in good faith, everything which the trust, accepted by them in 1848, required of them.   So far from attacking the validity of the assignment, the plaintiff claims that by virtue thereof he is entitled to maintain this suit.   No fraud or collusion is charged upon the assignees.   They are attorneys of ability and large experience in the practice of the law.

If the mortgages executed by Moses Noble were fraudulent, as charged by the plaintiff, it is inexplicable how that fact should escape detection by the assignees.   In view of the great lapse of time, and the acquiescence of the assignees and creditors in the validity of these mortgages, the presumption is of the strongest character that the charge of fraud set up in the bill is unfounded.

" It is a rule of equity, founded upon the analogies of the law, where such analogy exists, and sometimes upon its inherent doctrine, not to entertain stale or antiquated demands, and not to encourage laches and negligence.   Hence, in matters of account, although not barred by the statute of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy ; from the difficulty of doing entire justice when the original transactions have become obscure by time, and the evidence may be lost ; and from the consciousness that the repose of titles and the security of property are mainly promoted by a full enforcement of the maxim, *vigilantibus, non dormientibus jura subveniunt.*"   1 Story's Eq. Jur., sec. 529.   Courts of equity discourage stale demands " by refusing to interfere where there have been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights.''   2 *ib.*, sec. 1520.

In *Smith* v. *Clay*, 3 Bro. Ch. Rep. 640, Lord CAMERON said,—" A court of equity, which is never active in relief against conscience or

public conscience, has always refused its aid to stale demands, where
the party has slept upon his right, or acquiesced for a great length of
time.   Nothing can call forth this court into activity but conscience,
good faith, and reasonable diligence.  Where these are wanting, the court
is passive, and does nothing.   Laches and neglect are always discounte-
nanced, and therefore, from the beginning of this jurisdiction, there was
always a limitation to suits in this court."   The authorities upon this
point, both English and American, are numerous and conclusive, and
are cited in 2 Story's Eq. Jur., ch. 42, sec. 1520, *n.* 1.

In *Bassett* v. *Company*, 47 N. H. 442, where the plaintiff had acquiesced
for six or seven years in the claim and use made by the defendants of
his land, BELLOWS, J., said,—" In equity, therefore, at least the claim
the plaintiff had purchased must be regarded as somewh.... ..., an..,
on an application to the discretion of this court to prevent injustice,
the fact that such purchases were so made and for the objects shown
by the proofs, would be a strong if not decisive objection to granting
the injunction."

It is true that it is a rule in equity, well founded, that no length o
time will bar a fraud.   Yet a court of equity will not impeach a trans
action on the ground of fraud, where the fact of its having been com
mitted has been within the knowledge of the party many years.  2 Dan
Ch. Prac. 736.  But the plaintiff alleges that he has recently discovered
the fraud set up in the bill, and that the rule, therefore, does not apply
in this case.   But all the circumstances of fraud which he alleges
might have been discovered if he had exercised ordinary diligence.
The defendant's mortgage was promptly recorded.  She has been in
open possession of the mortgaged premises for twenty-six years, taking
the rents and profits.   A demand might at any time have compelled
her to render an account under oath of the amount due her secured by
mortgage, under penalty of losing her security.   Rev. Stats., ch. 184,
sec. 7 ; *ib.* ch. 131, sec. 8.   There is no allegation that she has con-
cealed any facts, or given the plaintiff any false information, or that
the assignees were ignorant of her mortgage and judgment, or of the
consideration of the same.   I cannot see that the plaintiff has exercised
any diligence whatever in ascertaining the true condition of the de-
fendant's title.   The public record of her mortgage, and her open and
notorious possession for more than a quarter of a century, acquiesced
in by Moses Noble, his assignees and legal representatives, was notice
to the plaintiff amply sufficient to put him upon inquiry, to say the least,
and therefore to charge him with a knowledge of all he would have
learned upon inquiry, and his neglect is wholly inexcusable.   The
argument of the defendant's counsel in this connection is in point.
" He cannot avoid the effect of the lapse of time, and compel the de-
fendant to answer simply by averring that he has just discovered the
fraud, 'otherwise,' says Mr. Fonblanque,—1 Eq. 331, book 1, ch. iv, sec.
27,—' the mere imputation of fraud might operate as a fraud, or the
evidence might be lost by which the imputation might be repelled.'
Upon such pretences every title in the state might be overhauled back

to the date of the earliest conveyance, and the tenants be put to prove the consideration of every deed, however ancient."

For these reasons the bill must be dismissed. This result makes it unnecessary to examine the other causes of demurrer.

CUSHING, C. J. I fully concur in what has been said by my brother SMITH. The case of *Sugar River Bank* v. *Fairbanks*, 49 N. H. 131, may be cited as well illustrating the views which the courts in our own state have taken of this class of cases.

LADD, J., concurred.

*Demurrer sustained.*